**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LINCOLN BENEFIT LIFE COMPANY** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **ROBERT BOWMAN** | **:** | **NO. 15-6697** |

_____

| | | |
|---|---|---|
| **LINCOLN BENEFIT LIFE COMPANY** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **ROBERT BOWMAN, as Executor of the** | **:** | |
| **Estate of Paul J. Godlewski** | **:** | **NO. 15-6698** |

_____

| | | |
|---|---|---|
| **LINCOLN BENEFIT LIFE COMPANY** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **BRIAN CHABOREK** | **:** | **NO. 15-6699** |

_____

| | | |
|---|---|---|
| **LINCOLN BENEFIT LIFE COMPANY** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **BRIAN CHABOREK** | **:** | **NO. 15-6700** |

_____

| | | |
|---|---|---|
| **LINCOLN BENEFIT LIFE COMPANY** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **CHRISTINA HINES and GAIL COUTU** | **:** | **NO. 15-6701** |

_____

LINCOLN BENEFIT LIFE COMPANY          :          CIVIL ACTION
                                      :
            v.                        :
                                      :
ROBERT BOWMAN, as Executor of the     :
Estate of Paul J. Godlewski; MICHAEL  :
HAYDEN, MICHAEL NORCINI, TONE         :
2000, LLC, ROBERT BINGHAM, ROBERT     :
SASSANI, JOSEPH GODLEWSKI, ADRIANA    :
CALAF, ROBERT BOWMAN, JENNIFER        :
HATTON, FRANZ DOBLER, ANDREW          :
FRITZ and BRIAN CHABOREK              :          NO. 15-6702
                          _____

LINCOLN BENEFIT LIFE COMPANY          :          CIVIL ACTION
                                      :
            v.                        :
                                      :
VALENTIN RADU                         :          NO. 15-6703


                    <u>MEMORANDUM OPINION</u>

**Savage, J.**                                      **October 20, 2016**

       In these cases seeking to void life insurance policies, Lincoln Benefit Life
Company ("Lincoln") started out claiming its insured faked his death, shifted to claiming
he committed suicide and most recently contends he made material misrepresentations
in his applications.   Moving for summary judgment, Lincoln argues the undisputed
material facts establish that Paul Godlewski, its insured, knowingly made
misrepresentations regarding his mental and physical health in his applications.   The
defendants, the beneficiaries, counter that the misrepresentations were not material
because Lincoln knew of Godlewski's mental and physical health conditions; and, if it did
not, it still would have issued the policies at the same rates.

       There is no question that Godlewski made misrepresentations about his medical
history and health.   However, because there are genuine issues of fact regarding his

                                      2

intent in the application process and the materiality of the misrepresentations, a jury must decide whether Lincoln would have issued the policies had it known his medical history. The jury must determine whether Lincoln would have deemed the omitted information material or is now claiming that it was material in order to avoid paying the beneficiaries. Therefore, we shall deny Lincoln's motions for summary judgment.

We shall also deny the parties' cross-motions for summary judgment on the issue of whether Lincoln conducted its investigation into the cause and manner of Godlewski's death in bad faith.   A jury must decide whether there was sufficient proof of death and whether Lincoln's investigation demonstrated a reasonable basis for questioning and refusing the claims.

## Background

On June 10, 2015,[1]  Paul Godlewski's body was found floating in Chalk Sound in the Turks and Caicos Islands.   The cause of death listed on the death certificate was "(A) Acute Coronary Artery Thrombosis" and "(B) Drowning."[2]   The cause of death, after an autopsy, was determined to have been "Coronary Artery Thrombosis which most likely triggered a fatal arrhythmia (Heart Attack)."[3]

At the time of his death, Godlewski had ten life insurance policies underwritten by Lincoln.[4]   When three of the policies had lapsed for non-payment of premiums in 2013 and 2014, Godlewski successfully applied to reinstate them.[5]   Between 2013 and 2015, he submitted applications for four new policies.[6]

Lincoln filed declaratory judgment actions against the beneficiaries of seven of the policies.   Six seek to void the policies for material misrepresentations.[7]   In those cases, in addition to asserting material misrepresentations, Lincoln alleged that Godlewski was

not dead and the body found in the Turks and Caicos Islands was not his.   In the alternative, it alleged he had committed suicide.   Lincoln no longer disputes that it was Godlewski who died in Chalk Sound.

Unlike the six other actions, the remaining action does not seek to void the policy on the basis of material misrepresentations.[8]   Instead, Lincoln's complaint alleged that Robert Bowman, the beneficiary, failed to establish due proof of Godlewski's death, and that payment was barred or limited based on the cause and manner of death.[9]   Bowman filed a counterclaim for bad faith, contending that Lincoln conducted an inadequate investigation into the cause and manner of Godlewski's death,[10] unjustifiably refused to pay him, and claimed that he had murdered Godlewski.[11]

In May 2016, five months after Lincoln filed its complaint, Lincoln paid Bowman $305,802.[12]   In October 2016, it withdrew its complaint.   The only remaining claim is Bowman's for bad faith.   The parties filed cross-motions for summary judgment on the bad faith issue.[13]

The defendants also filed a counterclaim for bad faith in the six other actions.   Like in Bowman's counterclaim, the beneficiaries contend that Lincoln's investigation into the cause and manner of Godlewski's death was inadequate.   The counterclaims also contend that Lincoln's assertion of material misrepresentations in Godlewski's applications is unfounded.[14]

In its motions for summary judgment in the six other actions, Lincoln relies primarily on the material misrepresentation theory.   When Godlewski applied for the new policies and for reinstatement of the lapsed policies, he was asked questions regarding his past medical history and current health.[15]   Lincoln contends he did not disclose

information that was material to its decision to insure his life. The questions and responses Lincoln relies upon to support its claim of misrepresentation are:

> "1. In the past 10 years (or since becoming insured under this policy, if less) has any person insured or proposed for insurance under this policy been diagnosed with, or sought or received treatment or advice for:  . . .
>
>> Q: dependency on or addiction to alcohol or any drug?
>> A: No . . .
>>
>> Q: epilepsy or seizures, disorder of the brain or nervous system, depression, or other mental or nervous disorder?
>> A: No . . .
>
> 2. Other than previously disclosed, in the past 5 years, have any Proposed Insureds:
>
>> Q: had a checkup, consultation, hospitalization, illness, surgery, or medical or diagnostic test?
>> A: No
>>
>> Q: been advised to have a medical consultation, diagnostic test, or surgery that has not been done?
>> A: No
>
> 3. Are any Proposed Insureds taking any prescription medications not previously disclosed?
>
>> A: No . . .
>
> 7. Do any Proposed Insureds plan to spend more than 2 weeks outside the U.S. in the next year?
>
>> A: No."[16]

When an applicant answers "yes" to any of the medical history inquiries, he is instructed to provide details, including the medical condition, how it was treated, the relevant dates, the current status, and the name and address of the physician and/or facility associated with the condition.[17]  The only additional information Godlewski disclosed in response to any of the questions was that he had checkups with his primary

care physician, Dr. Albert Cuozzo.   Godlewski reported "regular" results in February 2011,[18] "normal results other than Doctor wanted me to lose weight" in August 2011,[19] "regular" results in February 2012,[20] "results were good (no problems)" in January 2014,[21] and "good results" in February 2014.[22]   In one application for reinstatement, Godlewski answered "yes" in response to the question regarding prescription medication usage. He added that he took "fish oil, multivitamins, and vit[amin] B12 (over the counter) – not prescribed by doctor."[23]

Godlewski did not report that he had been hospitalized three times and had treated with two psychiatrists for anxiety over the course of four years.   He did not reveal that he had been prescribed and taken benzodiazepines.   Lincoln did not learn these facts until after he died.   Lincoln claims that had Godlewski supplied truthful and complete information, it would not have issued the new policies or renewed the other policies. Therefore, it seeks to void the policies.

## Discussion

To void an insurance policy, the insurer must establish, by clear and convincing evidence, three elements: (1) the insured made a false representation; (2) the insured knew the representation was false or made it in bad faith; and (3) the representation was material to the risk being insured.   *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005).

There is no bright-line rule that applies in evaluating a summary judgment motion seeking to void an insurance policy for misrepresentations.   Each case must be decided by applying the clear and convincing evidence standard.   *Nw. Mut.*, 430 F.3d at 131. Summary judgment may be entered when the "only reasonable inference a fact finder

could draw is that the applicant's answers were knowingly false, or made in bad faith." *Id.* at 132.   In other words, on summary judgment, the question is whether a jury, applying the clear and convincing evidence standard, could only find for the insurer. *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 522 (3d Cir. 2004).

There is no question Godlewski made misrepresentations.   He failed to disclose that he had been hospitalized three times, once in 2012 and twice in 2013.   He did not report that he had visited two different psychiatrists numerous times over four years.   Nor did he list the various medications he was taking for anxiety.

Godlewski had a duty to disclose this information.   The omission of medical information constitutes a misrepresentation. *Justofin*, 372 F.3d at 522.   Signing a waiver or authorization for the release of medical information does not relieve the applicant of his affirmative obligation to provide truthful information.   *Nw. Mut.*, 430 F.3d at 133.

It is not clear that Godlewski misrepresented his drug and alcohol use. Undoubtedly, the hospital records reference "overdose" and "polysubstance abuse."[24] They also suggest that a mixture of drugs and alcohol played a role in causing the injuries that led to his hospitalizations.   However, no excessive amount of drugs was found in testing. The medications had been prescribed.   Indeed, testing was negative for benzodiazepines during his June 2012 hospitalization.[25]   The beneficiaries contend that although he tested positive during the other two hospitalizations, his use was consistent with what had been prescribed.[26]   In one instance, he was given lorazepam during his hospitalization.[27]   Blood toxicology revealed no more than negligible levels of blood alcohol content.[28]

That evidence does not clearly and convincingly prove substance abuse.   On the contrary, it suggests misuse, not abuse.   The mere reference in the records of a drug overdose does not prove that Godlewski abused drugs.   It means that he had a reaction caused by ingesting more than the prescribed dosage.   It could have been accidental or intentional.   It was not characterized as chronic or acute.   It could have been an isolated incident or part of a pattern.

Godlewski was not treated for "dependency on or addiction to alcohol or any drug."[29]   As noted, the mixture of alcohol and drugs led to the head injuries for which he was hospitalized.   But, he was treated on those three occasions for the consequences, not the cause.   Thus, a reasonable jury could conclude that his answer to the drug and alcohol question was not false.

Even if Godlewski did abuse drugs and alcohol, his failure to reveal the abuse was not necessarily made knowingly or in bad faith.   The incidents could have been perceived as accidental and isolated.   Godlewski could have honestly believed that he did not abuse drugs or alcohol.

On the other hand, it is difficult to conclude that Godlewski did not knowingly omit his three hospitalizations and numerous psychiatric treatments.   Nevertheless, his intent is a question for the jury.   An insured's state of mind is a jury issue.   Determining an insured's intent requires drawing inferences about which reasonable persons might differ. *Justofin,* 372 F.3d at 523.   Hence, "the issue of intent is 'particularly inappropriate for resolution by summary judgment.'"   *Id.*   (quoting *Riehl v. Travelers Ins. Co.*, 772 F.2d 19, 24 (3d Cir. 1985)).

With respect to his anxiety, Godlewski may not have considered it a "mental or nervous condition."[30]   The term is not defined in the application.   A jury, calling on life experience, could conclude that anxiety is not a "disorder" in the eyes of an applicant.   In that case, the jury could find that Godlewski had no intent or bad faith when he answered he had not been diagnosed with or treated for a mental or nervous disorder.

Even if Lincoln could demonstrate Godlewski's intent, it is not enough for the insurer to show that he made a misrepresentation knowingly or in bad faith.   It must establish that the misrepresentation was material.

A misrepresentation is material where the actual information would have influenced the insurer's judgment in deciding whether to issue the policy or in fixing the premium.   *Justofin,* 372 F.3d at 524 (citing *Piccinini v. Teachers Protective Mut. Life Ins. Co.*, 463 A.2d 1017, 1024 (Pa. Super. 1983)).   In other words, the question is whether the insurer would have declined to issue the policy or demanded a higher premium had it known of the undisclosed risk.   *See Rohm & Haas Co. v. Cont'l Cas. Co.*, 781 A.2d 1172, 1179 (Pa. 2001).

The focus of the materiality inquiry is on the risk assumed, not on the loss incurred. *Shafer v. John Hancock Mut. Life Ins. Co.*, 189 A.2d 234, 237 (Pa. 1963).   Put differently, a misrepresentation may be material even if the death was not caused by the health condition misrepresented or omitted.   *See, e.g.*, *Sadel v. Berkshire Life Ins. Co. of Am.*, No. 09-612, 2011 WL 292239, at *9 (E.D. Pa. Jan. 31, 2011) (citing *Am. Franklin Life Ins. Co. v. Galati*, 776 F. Supp. 1054, 1060 n.9 (E.D. Pa. 1991)).

In the life insurance context, materiality is a question for the fact finder when it is not clear that the insurer would have declined coverage or demanded higher premiums

had it known the undisclosed facts regarding the insured's health.   *Justofin*, 372 F.3d at 524–25.   The jury may ask whether the insurer actually would have declined coverage or charged a higher premium had it known of the undisclosed information at the time Godlewski applied, or only now, in order to avoid paying the policy amount, claims that the information would have mattered.

In determining whether the missing information was material, the fact finder must consider how it would have affected Lincoln's decision to insure Godlewski.   To perform this analysis, one must understand the underwriting process and apply it to the facts.

In underwriting life insurance policies, Lincoln evaluates the applicant's age and the dollar value of the prospective policies to determine the minimum underwriting requirements.[31]   Once Lincoln identifies which set of minimum requirements apply to a particular individual, the underwriter assesses the applicant's medical history using the Swiss Re manual, which rates an applicant's state of health based on a variety of medical disorders.[32]   The ratings assigned to each disorder allow the insurer to assess the risk and to determine whether to issue a life insurance policy and, if so, to fix the premium.[33] The insurability and premium determinations depend on "the attributes of the disorder, the severity, the frequency, level of treatment, the description, [and] the impact it has on the person's health as observed by the doctor and reported."[34]

The underwriter identifies health "credits" and "debits," which assign increased or decreased risks of mortality.   A health debit yields a higher mortality risk than average. A health credit results in a lower than average mortality risk.[35]   After identifying the minimum requirements based on the applicant's age and the amount of insurance

requested, the underwriter applies the health credits and debits to determine insurability and calculate the premium.

The underwriting process is not entirely objective.  The underwriter exercises "learned discretion" in making the final rating determination.[36]   As Lincoln's chief underwriter described the underwriter's role in the process, "based on all the information you have in front of you, you have discretion as to how you are issuing the policy given what you know."[37]

Applying the clear and convincing evidence standard to the hospital records and the psychiatrists' notes, we cannot conclude that a jury could only find for Lincoln.   The evidence presents confusing and conflicting facts and conclusions regarding Godlewski's medical condition.   Whether Lincoln, given these concerns, would have declined coverage, as it now claims it would have, calls for an evidentiary determination by the jury.

That the applicant has been hospitalized or treated by a psychiatrist does not necessarily disqualify him.   It is the medical condition for which he was hospitalized and treated that is material.   Thus, the questions on the application are intended to lead to sources of information that the underwriter may use to determine the insurable risk.

Because it is the underlying medical condition that is material, the underwriter must analyze the records to discern the severity of the condition.   She must take into consideration "the attributes of the disorder, the severity, the frequency, level of treatment, the description [and] the impact it has on the person's health as observed by the doctor and reported."[38]   To accomplish this task, she must make judgment calls, using her discretion, in resolving conflicts and contradictions in the records.   She then decides what Swiss Re rating table to use.

Against this backdrop of the underwriting process, we shall review the hospital and the psychiatric records that Lincoln should have had.   If the records provide clear and convincing evidence of medical conditions that would have led Lincoln to decline coverage, Lincoln is entitled to summary judgment.   If not, the jury must decide the issue.

The records do contain findings and references that may support a conclusion that Godlewski suffered from anxiety.   But, on the other hand, there are notations and observations that contradict or mitigate the severity of his condition.   Lincoln's chief underwriter has opined that had Lincoln known of Godlewski's physical and mental health condition, it would have declined coverage.   Her credibility is for the jury to determine.

Lincoln agrees that materiality presents a jury question.   In its response to Chaborek's motion to exclude hospital records, Lincoln concedes that whether the conflicting evidence in the records, together with all the other evidence, "makes Godlewski's misrepresentations material is, at least, a question of fact for the jury."[39]

*Godlewski's Hospitalizations*

In June 2012, Godlewski was hospitalized after he fell and struck his head.   The EMT opined that he had overdosed on medication.[40]   The hospital physician's primary diagnosis was "polysubstance overdose."[41]   On admission, Godlewski reported a history of frequent headaches, alcohol abuse, anxiety, depression, and gout.[42]   The physician wrote that Godlewski had a "past medical history of substance abuse."[43]   The hospital notes state that prior to the fall, he had consumed alcohol along with lorazepam and Ambien, a sleep aid.[44]   There is no mention of the quantity consumed.   However, blood testing taken the day of his admission reflected an alcohol level below the detectable amount.[45]   A urine toxicology screening tested negative for benzodiazepines.[46]   As

noted by the admitting physicians, Godlewski was not suffering from "Ethanol/drug abuse."[47]

The diagnostic impression was an "anxiety disorder."[48]   A consulting psychiatrist recommended that Godlewski follow up with outpatient psychiatry and psychotherapy for anxiety and stress management.[49]

Ten months later, in April 2013, Godlewski spent two nights in the hospital after again injuring his head in a fall.[50]   The records note that he drank an "unknown amount" of alcohol with prescription medications prior to his fall.[51]   He apparently reported that he took "[d]ramamine, Lorazepam and he had a couple of beers."[52]   Yet, blood testing taken on the day of his admission demonstrated an alcohol level below the detectable amount of 10 mg/dL.[53]

The parties dispute the reliability of the tests.   The dispute arises from the conflicting evidence about when Godlewski fell—the same day he was admitted to the hospital or two days earlier.   Lincoln contends that the tests were taken on Wednesday, two days after he had ingested the drugs and alcohol.   On the day of Godlewski's admission, April 3, 2013, the physician wrote, "[p]atient stated he had some alcohol unknown amount and had fallen on Monday," two days before admission.[54]   However, the clinical notes dictated the next day, April 4, 2013, state that Godlewski was "drinking on day of admission; while in hot tube [sic] he passed out and hit his head."[55]   Relying on this note, the beneficiaries contend that the blood tests are accurate and reliable.   How the underwriter would have resolved the conflicts regarding the date of the fall and the reliability of the blood test is a question for the jury.

During a visit to the Turks and Caicos Islands in September 2013, Godlewski was hospitalized for two nights after he nearly drowned while snorkeling.[56]   On the morning of the incident, Godlewski took eight milligrams of lorazepam with a "beer/rum punch at lunchtime."[57]   It is not clear from the record whether Godlewski recalled the incident or not.   The clinical notes state that he did "not remember if he lost consciousness in the water or on the beach" and his last memory was drinking rum.[58]   On the other hand, the doctor reported that he had "total amnesia of the event," he could not "recall the events that led to his hospitalization and [he kept] looking for answers."[59]   The primary diagnosis was benzodiazepine overdose and the secondary diagnosis was panic attacks.[60]   He reported that he had seen a psychiatrist, had been prescribed lorazepam and clonazepam, and had overdosed on lorazepam in May 2013.[61]

The inconsistent information in the three hospital records presented conflicts that the underwriter would have had to resolve.   Without an explanation how Lincoln would have treated this information, one cannot conclude that Lincoln would have declined coverage as it now claims.

*Godlewski's Psychiatric Treatment*

Even if Godlewski suffered from anxiety, which the beneficiaries deny, it is unclear whether it was severe enough to be material.   In assessing an anxiety disorder, Lincoln relies on the Swiss Re manual to classify the severity of the condition.   The manual defines three levels of anxiety disorders: mild, moderate, and severe.[62]   A mild case of anxiety is described as a tendency towards "panic, phobia, or obsessive compulsive anxiety disorder[] with stress."[63]   An individual falling into the mild anxiety category has never been referred for either inpatient or outpatient psychiatric treatment or counseling,

and has not missed time from work or demonstrated any physical illness.[64]   At the next level, a moderate anxiety disorder is characterized by occasional episodes of anxiety "with satisfactory response to treatment."[65]   In the case of moderate anxiety, the applicant may have been referred for outpatient psychotherapy, never inpatient. Moderate anxiety may result in no more than one to two weeks off work and there is no persisting "environmental stress."[66]   A severe anxiety disorder consists of "deeper anxiety for which inpatient care may be necessary," persisting environmental stress, and disabling attacks that may cause more than two weeks off of work on any one occasion.[67]

The distinguishing characteristics of the anxiety levels are based, in part, on the treatment associated with the condition. Mild anxiety is marked by no treatment or counseling; moderate, by outpatient psychotherapy; and severe, by inpatient treatments. Godlewski received recommendations to seek outpatient counseling for his anxiety.[68] As we now know, he was treated by two psychiatrists.   He never received inpatient treatment.

Godlewski saw Dr. Michael Dorfman, a psychiatrist, on thirty-four occasions from February 2011 until May 2015.[69]   Over the course of more than four years, Dorfman did not definitively classify Godlewski's anxiety symptoms.[70]   When asked to describe Godlewski's condition overall, Dorfman described the anxiety as "on the milder side" and "possibly moderate at times."[71]

Godlewski saw the other psychiatrist, Dr. Les Linet, seven times in five months in 2013.[72]   Linet diagnosed Godlewski with a panic disorder.[73]   The beneficiaries point out that Linet's notes are inaccurate and his deposition testimony is incredible.[74]   Linet's records appear to apply to another patient or are mixed with those of another patient.

The notes describe Godlewski as a "child" suffering from ADHD whose "parents are legally responsible for his care."[75]   Linet wrote that Godlewski feared ghosts and was a victim of sexual abuse.[76]   There is nothing in the record to support these notations.

Linet admitted in his deposition that many references to observations in Godlewski's file did not apply to him. He explained away these records as part of a template he copied and pasted into the patient's chart prior to each visit.[77]

The issue is not whether Linet is credible and reliable.   It is whether Lincoln would have relied upon his conflicting and obviously incorrect statements.   A jury could conclude that Lincoln would have discounted or disregarded Linet's questionable notes.

The medical records and testimony present conflicting and ambiguous evidence about Godlewski's mental health.   Linet diagnosed Godlewski with a panic disorder.[78] However, Dorfman, the psychiatrist who saw Godlewski before, during, and after he was treated by Linet, did not reach that conclusion.   It is not clear whether Dorfman diagnosed Godlewski with any definable anxiety syndrome.   The characteristics described in Dorfman's notes fit within the Swiss Re definition of moderate anxiety while sharing characteristics of the mild form.

Valerie Munchez-Van der Wagt, Lincoln's chief underwriter, testified that in her view, Godlewski's anxiety would have been classified as severe under the Swiss Re guidelines.[79]   She used many different labels to describe his condition, including: nervous disorder, panic disorder, depression, extremely high stress, uncontrolled high anxiety, mental disorder, and compulsive disorder.[80]   According to her, because the "nervous disorder had never been completely stabilized," Lincoln would not have issued a policy to someone with this history.[81]   At her deposition, she stated conclusions without

pointing to information in the records to support them.   She was unable to specifically cite to Godlewski's medical records to support her conclusions because she did not have them before her.   There is little discussion regarding the contradictory details in Godlewski's medical history.

Similarly, Lincoln's claim that Godlewski failed to disclose a history of depression depends on whether he suffered from depression and the underwriter would have concluded that he did.   Again, the underwriter would have confronted conflicting evidence.   Although Linet prescribed Godlewski an antidepressant, he testified that it was prescribed to treat Godlewski's panic disorder and not for depression.[82]   Moreover, Linet's records, the reliability of which are suspect, are not corroborated by Dorfman, who did not note a history of depression and with whom Godlewski had treated for a longer period of time.[83]

In light of Dorfman's characterization of Godlewski's mental condition and Van der Wagt's contention that it was much more severe, a jury may perceive her testimony as self-serving.   A jury must assess her credibility.   We cannot do so on summary judgment.

*Godlewski's Drug and Alcohol Use*

Lincoln has not produced clear and convincing evidence that Godlewski's drug and alcohol use would have been material to its underwriting decisions.   Nor, as we have noted, has Lincoln demonstrated that Godlewski's drug and alcohol use rose to the level of abuse.   The fact that Godlewski did not disclose that he had been prescribed drugs, standing alone, is not material.   *See Justofin,* 372 F.3d at 525.   Nor is the fact that he had been hospitalized and consulted with psychiatrists.   Indeed, Van der Wagt

conceded that the touchstone in its underwriting analysis is the underlying disorder, not the fact of hospitalization or treatment.[84]

Dorfman indicated that Godlewski's prescription dosages were "typical" and as compared to the average patient, the dosages were "not uncommon."[85]  On the other hand, Lincoln asserts Godlewski's prescriptions changed throughout his treatment, the dosages continuously increased, he "was in a habit of taking excessive amounts of prescription drugs,"[86] and he self-treated.[87]

Lincoln contends that Godlewski's intentional mixing of alcohol and drugs would have rendered him uninsurable.   It relies on Van der Wagt's testimony that he "ended up in the hospital because of use of prescription drugs and alcohol" and engaged in this behavior in risky situations, such as in a hot tub or while snorkeling.[88]  She explained that Godlewski's comprehensive medical history demonstrates "alcohol use, overuse, and its effect[s]"[89] which led her to conclude that he would fall into the category of alcohol abuse, a form of an alcohol use disorder.[90]   However, it is not for us to determine whether Van der Wagt's conclusions are credible.

The beneficiaries contend Godlewski's failure to disclose his insomnia was not material because Lincoln was already aware of it.   Indeed, Lincoln was in possession of medical records indicating that Godlewski had taken Ambien for nocturnal arousals, "vivid" dreams and "dream enactment behavior" when he applied for reinstatement.[91] The fact that Lincoln knew of Godlewski's insomnia did not relieve him of his responsibility to disclose truthful information.   *See Nw. Mut.*, 430 F.3d at 133; *Justofin*, 372 F.3d at 522.

Nevertheless, Lincoln bears the burden to prove that the omission of his insomnia symptoms was material.   Van der Wagt explained that his insomnia was "an issue based on his unstable day-to-day existence."[92]   However, she did not opine as to whether knowledge of the insomnia would have altered Godlewski's premium or otherwise changed Lincoln's decision to insure him.

Godlewski's responses to the questions about his travel plans were clearly not a misrepresentation and are not material.   There is no evidence that Godlewski had travel plans when he submitted his applications.[93]   Even if he did, Lincoln would not have demanded higher premiums or declined to issue coverage.   Van der Wagt testified that Godlewski's plans to travel to the Turks and Caicos Islands would not have impacted its decision.[94]

Van der Wagt cites notations in the hospital records and psychiatric outpatient treatment notes.   She identifies conditions listed in the Swiss Re manual, opining that these conditions would have disqualified Godlewski from coverage.   She did not testify how the numerous variables and factors used in the manual and the underwriting process affected her present opinion on insurability.   As she explained, the underwriter exercises discretion in the process.[95]   Injecting the underwriter's subjectivity into the analysis could give rise to a concern that the conclusions she reached after Godlewski's death may have been influenced, directly or indirectly, by a desire to void the policies.

The jury could reasonably ask whether the conflicting evidence in the records would have led Lincoln to insure Godlewski even if it had those records.   It could also decide the underwriter would have exercised discretion in favor of insuring him.   In the

end, the jury must determine whether Lincoln's current position was taken to avoid paying on the policies.

The beneficiaries also contend that Godlewski disclosed information in his applications that should have affected his premium, but because he had a business relationship with Lincoln, his rates remained unchanged.   They point out that Lincoln knew that Godlewski had multiple benign dysplastic nevi (atypical moles) removed, a family history of cancer and heart disease, and was an occasional cigar smoker.[96]   Yet, in deference to his status as an agent for an affiliated company, Lincoln insured him at standard non-smoker rates.

Van der Wagt testified that Godlewski's status as an Allstate agent was merely a "point of information," but admitted "there is a deference to the fact that we are in business with him."[97]   The beneficiaries argue that having treated Godlewski differently than other applicants with the same disclosed history, Lincoln cannot now claim that the rules that applied to all similar applicants should be applied to him.   Van der Wagt's testimony notwithstanding, a jury could find that because he had a business relationship with the company, Lincoln still would have insured him for the same premiums had it known of his past medical history.

There is no question that Godlewski misrepresented much of his medical and mental health history when he applied for insurance.   However, Lincoln has not carried its burden on summary judgment of proving, by clear and convincing evidence, that he did so knowingly or in bad faith and that the misrepresentations were material as a matter of law.   Therefore, we shall deny Lincoln's motions for summary judgment.

**Bad Faith**

With respect to each party's cross-motion for summary judgment on the bad faith claim, we review each motion under the same standards and burdens as if evaluating a stand-alone motion.   *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968)).   Each cross-motion must be considered separately.   *Williams v. Phila. Hous. Auth.*, 834 F.Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994).   In doing so, we must view the facts in the light most favorable to the nonmovant, drawing all reasonable inferences in his favor.   *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Bowman argues that Lincoln acted in bad faith when it failed to adequately investigate Godlewski's death before initially denying his claim for death benefits. Bowman was forced to defend the declaratory judgment action, incurring legal fees and costs before Lincoln eventually paid him benefits.   In its cross-motion, Lincoln argues that its investigation was proper and thorough.   It argues that the filing of declaratory judgment was necessary given the uncertainties surrounding the proof and manner of death.

To establish a bad-faith claim, the beneficiary must prove, by clear and convincing evidence, that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim.   *Nw. Mut.*, 430 F.3d at 137 (citing *Terletsky v. Prudential Prop. & Cas. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994)).   The beneficiary must show that the insurer acted "with a dishonest purpose" or "through some motive of self-interest or

ill-will." *Terletsky*, 649 A.2d at 688.   Mere negligence or bad judgment does not qualify as bad faith.   *Id.*

Refusing to pay without conducting a reasonable investigation of all available information is sufficient.   *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 515–16, 522–23 (3d Cir. 2012) (citing *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.,* 244 F. App'x 424, 433 (3d. Cir 2007)).   An insurer need not demonstrate that its investigation resulted in the correct conclusion.   *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004); *Cantor v. Equitable Life Assurance Soc'y*, No. 97-5711, 1999 WL 219786 at *3 (E.D. Pa. 1999).   Nor must the insurer show that its investigation was perfect.   Rather, an insurance company simply must show its investigation was sufficiently thorough to justify its decision to deny the claim.   *Cantor*, 1999 WL 219786 at *3; *see also Lehman v. Victoria Fire & Cas. Ins. Co.*, No. 09-1542, 2011 WL 2457928 at *9 (E.D. Pa. 2011) (collecting cases).

Upon notification of Godlewski's death, Lincoln sought records, including an incident report from the Turks and Caicos Police Department and a preliminary autopsy report.[98]   It retained an investigator to gather information, interview individuals, and request documents.[99]

Eleven months after it was notified of Godlewski's death and after it started this litigation, Lincoln paid Bowman.   It asserts that it did not pay sooner because Godlewski's body was not properly identified and there was a lack of due proof of death. Without this proof, Lincoln contends it had no duty to pay death benefits.[100]

Bowman argues that Lincoln neglected to pursue several leads, including its failure to reach out to a friend who purportedly identified Godlewski's body, to interview

the mortician, and to obtain photographic evidence of the decedent.   Lincoln counters that questions remained at the conclusion of its pre-litigation investigation.   It argues that no formal identification of Godlewski's body had been made.   According to Lincoln's guidelines in its claims manual on foreign deaths, proof of death outside of the United States must be "verified with absolute or reasonable and reliable proof (i.e., 'due proof')."[101]   For example, Lincoln considers whether the body of an American citizen is returned to the U.S. for burial, there is "verifiable and traceable" documentation of the death by foreign officials, a U.S. Embassy prepared a "Death of an American Citizen Abroad" form, the deceased's travel itinerary is substantiated, and whether there is proof of passport cancellation.[102]

Bowman points out that Lincoln had Godlewski's official death certificate and his body had been identified by the Turks and Caicos police when Bowman submitted his claim.   This information appears to meet the requirements of Lincoln's own guidelines in its claims manual on foreign deaths.   However, there were other concerns regarding the manner of death that arose during the initial investigation.   Lincoln then pursued those leads.   A jury could conclude that Lincoln acted reasonably in continuing to investigate.

Whether Bowman submitted sufficient proof of death and whether Lincoln's investigation was adequate present issues of fact that raise credibility questions. Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.   *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005).   Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury.   *Post*, 691 F.3d at 514

(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).  Therefore, we shall deny the cross-motions for summary judgment on Bowman's bad faith claim.

# FOOTNOTES

[1]  Lincoln contends Godlewski died on June 10, 2015, which is the date on the Turks and Caicos Islands death certificate.  *See* Statement of Undisputed Material Facts ¶ 25 & Ex. Q (Civ. A. No. 15-6702, Doc. No. 104-2) (hereinafter "SUF").   The beneficiaries contend he died on June 8, 2015, and his body was found two days later.   *See* Resp. to SUF ¶ 25 (Civ. A. No. 15-6702, Doc. No. 111) (hereinafter "Resp. to SUF").

[2]  SUF Ex. Q.

[3]  Resp. to SUF Ex. A.

[4]  Compl. ¶ 1 (Civ. A. No. 15-6702, Doc. No. 1); Answer ¶ 1 (Civ. A. No. 15-6702, Doc. No. 19).

[5]  SUF ¶¶ 15-16; *see also* SUF ¶¶ 7-8 (Civ. A. No. 15-6701, Doc. No. 29-2); SUF ¶¶ 4-5 (Civ. A. No. 15-6703, Doc. No. 24-2).

[6]  SUF ¶¶ 1, 10 (Civ. A. No. 15-6698, Doc. No. 31-2); SUF ¶ 1 (Civ. A. No. 15-6699, Doc. No. 37-2); SUF ¶ 1 (Civ. A. No. 15-6700, Doc. No. 36-2).

[7]  Civ. A. Nos. 15-6698, 15-6699, 15-6700, 15-6701, 15-6702 and 15-6703.

[8]  Compl. & Ex. A, Lincoln Benefit Life Company Flexible Premium Variable Adjustable Life Insurance Policy No. 02L1A12787 at 19 (Civ. A. No. 15-6697, Doc. Nos. 1, 1-1).   The incontestability clause prevents Lincoln from challenging its contractual obligations after the policy has been in effect for two years.   The parties agree that the incontestability provision applies.   *See* SUF ¶ 3 (Civ. A. No. 15-6697, Doc. No. 35); Resp. to SUF ¶ 3 (Civ. A. No. 15-6697, Doc. No. 37).

[9]  *See* Compl. (Civ. A. No. 15-6697, Doc. No. 1).

[10]  Am. Answer to Compl. at 7-11 (Civ. A. No. 15-6697, Doc. No. 24).

[11]  Mem. in Support of Mot. for Summ. J. at 2 (Civ. A. No. 15-6697, Doc. No. 35).

[12]  *See id.* at 3; Cross-Mot. for Summ. J. at 2 (Civ. A. No. 15-6697, Doc. No. 38).

[13]  *See* Civ. A. No. 15-6697, Doc Nos. 35, 38, 39, 41, 42.

[14]  Answer at 9 (Civ. A. No. 15-6698, Doc. No. 22); Answer at 11 (Civ. A. No. 15-6699, Doc. No. 5); Answer at 11 (Civ. A. No. 15-6700, Doc. No. 6); Answer at 11 (Civ. A. No. 15-6701, Doc. Nos. 5, 7); Answer at 11 (Civ. A. No. 15-6702, Doc. No. 19, 31, 32, 33, 49, 73); Answer at 11 (Civ. A. No. 15-6703, Doc. No. 11).

[15]  The reinstatement applications ask nearly identical questions as the original applications. *See, e.g.*, SUF ¶ 18 & Ex. N (Civ. A. No. 15-6702, Doc. No. 105-10); SUF Ex. G (Civ. A. No. 15-6701, Doc. No. 29-11); SUF Ex. D (Civ. A. No. 15-6703, Doc. No. 24-8); SUF Exs. A & C (Civ. A. No. 15-6698, Doc. Nos. 31-5, 31-7); SUF Ex. A (Civ. A. No. 15-6699, Doc. No. 37-5); SUF Ex. A (Civ. A. No. 15-6700, Doc. No. 36-5).

[16]  SUF Ex. N, Application for Reinstatement, ¶¶ 1.c, 1.e, 2, 3, 7 (Civ. A. No. 15-6702, Doc. No. 105-10).

[17]  SUF Ex. A at 2723-24 (Civ. A. No. 15-6698, Doc. No. 31-5).

[18]  *Id.*

[19]  SUF Ex. D at 2336-37 (Civ. A. No. 15-6703, Doc. No. 24-8).

[20]  SUF Ex. A at 2723-24 (Civ. A. No. 15-6698, Doc. No. 31-5).

[21]  SUF Ex. N at 3137 (Civ. A. No. 15-6702, Doc. No. 105-10).

[22]  SUF Ex. G at 1529 (Civ. A. No. 6701, Doc. No. 29-11).

[23]  SUF Ex. A at 2723-24 (Civ. A. No. 15-6698, Doc. No. 31-5).

[24]  SUF ¶ 52 & Ex. Z at 3713 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47).

[25]  SUF Ex. Z at 3706 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47).

[26]  *See* Resp. to SUF ¶ 41.

[27]  SUF Ex. X at 6299, 6338 (Civ. A. No. 15-6702, Doc. Nos. 105-25 to 105-30); Resp. to SUF ¶ 41. Lorazepam and clonazepam are within a class of drugs known as benzodiazepines.   *See* Resp. to SUF ¶ 101.

[28]  *See, e.g.,* SUF Ex. Z at 3627 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47).

[29]  *See, e.g.*, SUF Ex. N ¶¶ 1.c, 1.e, 2, 3, 7 (Civ. A. No. 15-6702, Doc. No. 105-10).

[30]  SUF Ex. N ¶ 1.e (Civ. A. No. 15-6702, Doc. No. 105-10).

---

[31] Resp. to SUF Ex. C, Dep. Tr. of Valerie Munchez-Van der Wagt at 37:8-13 (Civ. A. No. 6702, Doc. No. 111) (hereinafter "Van der Wagt Dep. Tr.").

[32] *Id.* at 11:10–13:16.   Van der Wagt, Lincoln's corporate designee, testified that "99 percent of [Lincoln's] decisions come out of the Swiss Re manual."   *Id.* at 12:11-12.

[33] *See id.* at 13:9-16, 14:20–15:6.

[34] *Id.* at 10:22–11:1.

[35] *See id.* at 39–40, 126.

[36] *Id.* at 167:20-25.

[37] *Id.* at 141:23–142:2.

[38] *Id.* at 10:22–11:1.

[39] Mem. in Opp. to Mot. in Lim. to Exclude Evid. of June 9, 2012 Hospitalization at 9 (Civ. A. No. 15-6702, Doc. No. 131) (September 2, 2016).

[40] SUF Ex. Z at 3788 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47).

[41] *Id.* at 3720 (see the "Discharge Summary"). The physician's notes also indicate Godlewski's "altered mental status" resulted from "substance abuse" that caused the fall.   *Id.* at 3713.

[42] *Id.* at 3623.

[43] *Id.* at 3711.

[44] *Id.* at 3715-16.

[45] *Id.* at 3705.

[46] *Id.* at 3706.

[47] *Id.* at 3627 (listing the procedure "Ethanol/drug abuse" with the response "no" under the "Adult Admissions Assessment" conducted on June 9, 2012, the day of Godlewski's admission); *id.* at 3635 (same, on June 10, 2012).

[48] SUF ¶ 56 & Ex. Z at 3717 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47).

[49] SUF Ex. Z at 3718, 3721 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47).

[50] SUF ¶ 40 & Ex. X (Civ. A. No. 15-6702, Doc. Nos. 105-25 to 105-30).

[51] SUF ¶¶ 40-41 & Ex. X at 6272, 6338 (Civ. A. No. 15-6702, Doc. Nos. 105-25 to 105-30).

[52] SUF Ex. X at 6338 (Civ. A. No. 15-6702, Doc. Nos. 105-25 to 105-30).

[53] *Id.* at 6339.

[54] SUF ¶ 40 & Ex. X at 6272 (Civ. A. No. 15-6702, Doc. Nos. 105-25 to 105-30).

[55] Resp. to SUF ¶ 40; SUF Ex. X at 6338; 6349 (Civ. A. No. 15-6702, Doc. Nos. 105-25 to 105-30).

[56] SUF ¶¶ 33-34 & Ex. V (Civ. A. No. 15-6702, Doc. No. 105-23).

[57] SUF Ex. V at 5746 (Civ. A. No. 15-6702, Doc. No. 105-23).   The beneficiaries, however, deny that Godlewski had consumed any alcohol.   Resp. to SUF ¶ 34.

[58] SUF Ex. V at 5741-42 (Civ. A. No. 15-6702, Doc. No. 105-23).

[59] *Id.*

[60] *Id.* at 4527-28.

[61] *Id.*

[62] Resp. to SUF Ex. O, Swiss Re Anxiety disorders Life ratings, at 5570-71 (Civ. A. No. 15-6702, Doc. No. 111).

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *See, e.g.,* SUF Ex. Z at 3718 (Civ. A. No. 15-6702, Doc. Nos. 105-32 to 105-47); Resp. to SUF ¶ 63.

[69] SUF ¶¶ 97-98; Resp. to SUF ¶¶ 97-98.

[70] For example, Dorfman characterized Godlewski's anxiety as "chronic." Counter-Statement of

Undisputed Material Facts ("CSUF") Ex. L, Dep. Tr. of Michael Dorfman at 65:11-12 (Civ. A. No. 15-6702, Doc. No. 111) (hereinafter "Dorfman Dep. Tr."). Dorfman also testified that Godlewski's anxiety "fluctuates," *id.* at 78:2-4, and was "intermittent." *Id.* at 72:4-6. He prescribed medication to deal with "breakthrough anxiety." *Id.* at 101:13-22. Throughout his relationship with Godlewski, Dorfman consistently recorded that his patient experienced stress from family issues, but that he was "coping effectively." *See, e.g.*, *id.* at 20:16, 36:12-14, 45:13-15, 46:14-17, 68:17-20, 69:9, 85:8-9, 85:14-17, 97:18-20, & 107:6-8. Dorfman also reported that Godlewski never missed work as a result of his anxiety. *See id.* at 128:4-6.

[71] CSUF ¶ 6.a (Civ. A. No. 15-6702, Doc. No. 111); Dorfman Dep. Tr. at 121:3-11.

[72] SUF at ¶¶ 64-65.

[73] SUF at ¶ 69 & Ex. HH, Dep. Tr. of Les Linet at 28:9-12, 48:24–49:4 (Civ. A. No. 15-6702, Doc. No. 106-13) (hereinafter "Linet Dep. Tr.").

[74] *See* Resp. to SUF ¶¶ 64-96.

[75] SUF Ex. AA at 3569-70, 3572 (Civ. A. No. 15-6702, Doc. No. 106-1).

[76] *Id.* at 3569, 3571.

[77] *See* Linet Dep. Tr. at 49–54.

[78] SUF at ¶ 69 & Linet Dep. Tr. at 28:9-12, 48:24–49:4.

[79] *See* Van der Wagt Dep. Tr. at 68:14-20, 79:18–80:1.

[80] *See, e.g., id.* at 68:23–69:6.

[81] *Id.* at 53:23–54:14.

[82] *See* SUF ¶¶ 80-81, 84; Linet Dep. Tr. 79:22–80:20.

[83] *See generally* SUF ¶¶ 97–210.

[84] *See* Van der Wagt Dep. Tr. at 12:21–13:25.

[85] Dorfman Dep. Tr. at 47:1-11, 80:1-18.

[86] Van der Wagt Dep. Tr. at 54:2-4, 73:19-20.

[87] *Id.* at 54:5-8.

[88] *See id.* at 57:11-16, 62:20-22, 72:8-12, 73:24-25.

[89] *Id.* at 64:11.

[90] *Id.* at 53:21-22.

[91] SUF ¶ 22.A & Ex. P at 2939 (Civ. A. No. 15-6702, Doc. No. 105-12).

[92] Van der Wagt Dep. Tr. at 56:21-22.

[93] In the following year, Godlewski traveled to the Bahamas once and to the Turks and Caicos Islands twice, including the trip during which he died. SUF ¶¶ 259-63. The beneficiaries contend those trips were not planned at the time he submitted his applications. Resp. to SUF ¶¶ 259-63.

[94] Van der Wagt Dep. Tr. at 20:9-14. Nor is there any evidence that a trip to the Bahamas would have been decisive.

[95] *See id.* at 167:20-25.

[96] *See, e.g., id.* at 124:25–126:3, 147:7-24, 137:12–138:9.

[97] *Id.* at 155:10–159:8.

[98] CSUF ¶¶ 24, 29 (Civ. A. No. 15-6697, Doc. No. 37-3).

[99] *Id.* ¶ 42.

[100] Compl. ¶¶ 33–39 (Civ. A. No. 15-6697, Doc. No. 1).

[101] Def. Resp. to Cross-Mot. for Summ. J. Ex. A, Lincoln Benefit Life Company Core Claims Manual: The Foreign Death Claim at 2-44 (Civ. A. No. 15-6697, Doc. No. 40).

[102] *Id.* at 2-44–46.